UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN MARSHALL,

                              Plaintiff,

            v.

THOMAS GRIFFIN, *et al.*,

                              Defendants.

No. 18-CV-6673 (KMK)

OPINION & ORDER

Appearances:

Steven Marshall
Napanoch, NY
*Pro se Plaintiff*

Jennifer R. Gashi, Esq.
State of New York Office of the Attorney General
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Steven Marshall ("Plaintiff"), currently incarcerated at Eastern Correctional

Facility, brings this pro se Action, pursuant to 42 U.S.C. § 1983, against Defendants regarding

incidents that occurred at Green Haven Correctional Facility ("Green Haven").[1]  (*See generally*

Am. Compl. (Dkt. No. 45).)  Before the Court is Moving Defendants' Motion To Partially

---

[1] "Defendants" refers to former Superintendent of Green Haven Thomas Griffin
("Griffin"), former Deputy Superintendent for Security Thomas Wilkins ("Wilkins"), correction
Captain Thomas Melville ("Melville"), correction Lieutenant Shawn J. Murphy ("Murphy"),
correction Lieutenant William J. Primley ("Primley"), correction officer ("C.O.") Joseph C.
Garcia ("Garcia"), C.O. Thomas A. Germano, Jr. ("Germano"), and C.O. Warren C. Freeman
("Freeman").  (*See* Dkt.; Am. Compl.)

Dismiss the Amended Complaint (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Not. of Mot. (Dkt. No. 51).)[2]  For the following reasons, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purpose of resolving the Motion.

Plaintiff was incarcerated at Green Haven at all relevant times.  (Am. Compl. ¶ 5.)  On October 12, 2015, Plaintiff began submitting grievances complaining of "ongoing acts of abuse, harassment, retaliation, and threats" from a subset of correction staff he refers to as the "Beat Down/Goon Squad."  (*Id.* ¶ 28.)  In that grievance, Plaintiff complained that a security officer had bragged to Plaintiff that there was "a new fucking regime" in place and that he could "crack [Plaintiff's] fucking head wide open with [his] fucking stick and murder [him]" if he wanted to. (*Id.* ¶ 30.)  The grievance was logged in the Inmate Grievance Program ("IGP") on October 22, 2015.  (*Id.* ¶ 32.)  Plaintiff alleges that Defendant Griffin responded on December 3, 2015, finding claims of this misconduct and the existence of the "Beat Down/Goon Squad" "unsubstantiated."  (*Id.* ¶ 33.)  On March 30, 2016, Plaintiff received a decision from the Central Office Review Committee ("CORC") "denying" Plaintiff's "requested actions" from his initial grievance.  (*Id.* ¶ 36.)

---

[2] "Moving Defendants" refers to Defendants Griffin, Wilkins, Melville, and Primley. The Motion does not seek dismissal of claims against Defendants Germano, Garcia, Freeman, and Murphy.  Moving Defendants seek dismissal of only Counts Five and Six from the Amended Complaint.  (*See* Moving Defs.' Mem. of Law in Supp. of Mot. ("Moving Defs.' Mem.") 1 n.1 (Dkt. No. 52).)

On April 1 and 6, 2016, Griffin allegedly responded to other grievances filed by Plaintiff, which pertained to unauthorized interference with Plaintiff's "inmate prison account" and obstruction of Plaintiff's "rights to seek redress" of his various grievances. (*Id.* ¶¶ 37–38.) It is unclear from the Amended Complaint what exactly Griffin's determinations were on these grievances. (*See id.* ¶¶ 37–38.) According to Plaintiff, by April 25, 2016, he had over 11 grievances pending in Green Haven's IGP. (*Id.* ¶ 39.)

On April 25, 2016, Plaintiff was allegedly attacked by Defendants Garcia and Germano. (*Id.* ¶ 40.) According to Plaintiff, he had returned to his housing block, the "E-Block," after eating his breakfast, when he encountered Garcia, who was blocking the entrance to the housing block's front doorway. (*Id.* ¶¶ 41–42.) Garcia instructed Plaintiff to wait downstairs on the housing block's "lower tier level flats area." (*Id.* ¶ 42.) Plaintiff was allegedly complying with all of Garcia's instructions when Plaintiff noticed that Germano was also in the area and gave a "type of head nod" to Garcia. (*Id.* ¶¶ 43–44.) Garcia then gave Plaintiff a "Direct-Order" to face the wall and put his hands on it. (*Id.* ¶ 47.) Plaintiff did so. (*Id.* ¶ 48.) Garcia stood behind Plaintiff and allegedly removed Plaintiff's religious head covering. (*Id.* ¶ 49.) Plaintiff then felt someone place a plastic bag over his head from behind him. (*Id.* ¶ 51.) Garcia grabbed Plaintiff and put him in a choke hold while Plaintiff attempted to take the plastic bag off his head. (*Id.* ¶¶ 52–53.) Meanwhile, Germano restrained Plaintiff's left arm to prevent Plaintiff from being able to take the plastic bag off. (*Id.* ¶ 53.) Garcia also yelled at Plaintiff, commenting that he "like[d] filing lawsuits and grievances against staff" and using racial slurs. (*Id.* ¶¶ 54, 56–57.) Plaintiff passed out, and when he woke up, he saw Garcia standing above him. (*Id.* ¶ 58.) Plaintiff saw "at least two other" unidentified correction officers standing nearby, all of whom had their batons out in a "threatening fighting stance." (*Id.* ¶ 60.) At this point, Plaintiff realized

that someone had placed his religious covering underneath his pants, partially inside his anus. (*Id*. ¶¶ 61–62.) The correction officers laughed at him and continued to call him names until Plaintiff managed to leave and return to his housing block. (*Id*. ¶¶ 66–74.) Although Plaintiff was too fearful to file a grievance about the incident immediately after it occurred, Plaintiff did write to New York Governor Andrew Cuomo, then-President Barack Obama, and other elected officials and advocacy groups about the incident. (*Id*. ¶¶ 74, 76–78.) Plaintiff came to learn that Garcia and Germano were allegedly members of the "Beat Down/Goon Squad," a subset of correction officers that repeatedly abused inmates at Green Haven. (*Id*. ¶ 75.)

On May 4, 2016, Plaintiff told his mental health counselor about the purported sexual assault. (*Id*. ¶ 81.) The mental health counselor reported it, in accordance with the Prison Rape Elimination Act ("PREA"), and subsequently, Plaintiff was taken to Green Haven's clinic to be interviewed. (*Id*. ¶¶ 81–82.) Plaintiff told the medical provider about the incident but felt intimidated by the presence of certain correction staff who allegedly stood inside the medical examination room, all with their batons drawn, refusing to provide Plaintiff with any privacy. (*Id*. ¶ 83.) Plaintiff was fearful that these staff members could be part of the "Beat Down/Goon Squad." (*Id*. ¶ 84.) Plaintiff alleges that, following this interview, he was taken back to his housing location in E-Block and placed in a 72-hour confinement in retaliation for complaining about the purported sexual assault. (*Id*. ¶ 86.) On May 5, 2016, Plaintiff wrote to Wilkins complaining of this retaliatory period of "keeplock confinement." (*Id*. ¶ 87.)

Plaintiff alleges that, on May 6, 2016, Defendant Freeman appeared outside Plaintiff's assigned cell. (*Id*. ¶¶ 89, 91.) Freeman directed Plaintiff to come to the front of his cell, and Plaintiff obeyed. (*Id*. ¶¶ 92–93.) Freeman then reached in through the bars and punched

Plaintiff in the face, causing Plaintiff to bleed from his lower lip. (*Id*. ¶ 94.) Plaintiff retreated to the back of his cell, and Freeman walked away. (*Id*. ¶¶ 97–98.)

On May 7, 2016, Plaintiff was released from his period of retaliatory confinement. (*Id*. ¶ 99.) On May 9, Plaintiff met with a physician to complain of right shoulder pain that he continued to experience from the assault allegedly perpetrated by Garcia and Germano. (*Id*. ¶ 100.) Plaintiff underwent some medical examinations on May 11. (*Id*. ¶ 103.) Plaintiff alleges that, following these examinations, he was once again placed in keeplock confinement. (*Id*. ¶ 105.) Although the Amended Complaint is unclear, Plaintiff appears to allege that he was placed in confinement because he refused to make any alterations to his PREA complaint against Garcia and Germano "at the direction[] of . . . Wilkins and Primley." (*Id*.) However, Plaintiff also alleges that it was an unidentified sergeant who brought Plaintiff down to the clinic to try to coerce him to make these changes. (*Id*.)

Plaintiff alleges that he continued to experience abuse and harassment in the E-Block. (*Id*. ¶¶ 107–09.) On May 12, 2016, Plaintiff filed another grievance addressed to Wilkins, complaining of the second period of retaliatory confinement that he experienced. (*Id*. ¶ 110.) Plaintiff also submitted more grievances regarding Garcia, Gremano, and Freeman's conduct. (*Id*. ¶ 111.) According to Plaintiff, Wilkins continued to ignore these grievances. (*Id*. ¶ 113.)

Plaintiff alleges additional instances of purportedly retaliatory threats and encounters with certain Defendants. For example, Plaintiff alleges that on May 17, 2016, Garcia and another unidentified security officer "confronted" Plaintiff when he had left his housing block to attend a mandatory "callout appointment." (*Id*. ¶ 114.) Garcia threatened to "get even" with Plaintiff for filing the grievance against him. (*Id*. ¶ 115.) On June 1, 2016, Garcia and another unidentified officer strip-searched Plaintiff in the corridor, forcing Plaintiff to strip down to his

underwear when Plaintiff was attempting to enter his housing block after receiving medication. (*Id.* ¶ 116.)

On June 14, 2016, Plaintiff was interviewed by Melville regarding the various incidents of which Plaintiff had been complaining, including the purported sexual assault perpetrated by Garcia and Germano. (*Id.* ¶¶ 118, 120.) Plaintiff claims that, although Melville knew they were within earshot of other correction staff, he conducted the interview outside of the housing block. (*Id.* ¶ 119.) Plaintiff asked Melville to assign him to a different housing block because he had continued to suffer incidents of harassment and abuse. (*Id.* ¶¶ 121–22.) Plaintiff alleges that, after this interview, he continued to suffer harassment and abuse, but does not specify what these incidents were. (*See id.* ¶¶ 124–25.)

On July 11, 2016, Melville allegedly returned to speak to Plaintiff again and once again conducted Plaintiff's interview within earshot of other correction staff. (*Id.* ¶ 126.) Melville asked Plaintiff to stop making formal grievances regarding his staff members and informed Plaintiff that he would consider moving Plaintiff out of the E-block. (*Id.* ¶¶ 130–31.) Two days later, on July 13, 2016, Plaintiff was relocated to the "A-Block" on the "Westside" of Green Haven. (*Id.* ¶¶ 132–33.)

Plaintiff claims that his new cell contained a broken sink that constantly leaked water, which affected his ability to sleep, his appetite, and his mental health. (*Id.* ¶ 134.) Plaintiff avers that his mental health continued to deteriorate. (*Id.* ¶¶ 135–36.)

On September 27, 2016, Plaintiff was placed in pre-hearing disciplinary confinement on a charge of leaving his hot pot plugged into his cell's outlet, creating a fire hazard. (*Id.* ¶ 137.) Plaintiff avers that these charges were false and retaliatory. (*Id.*) Plaintiff avers that harassment continued, but does not specify any particular incidents. (*Id.* ¶ 138.) In October 2016, Murphy

was designated as the hearing officer ("H.O.") in charge of Plaintiff's disciplinary hearing. (*Id.* ¶ 139.) Plaintiff believed that Murphy was retaliating against him for filing grievances about his colleagues by placing him in pre-disciplinary confinement for an excessive period of time, and Plaintiff subsequently began filing grievances about Murphy's conduct. (*Id.* ¶ 140.) On October 13, 2016, Plaintiff was moved out of A-Block and returned to the E-Block, where he was previously located. (*Id.* ¶ 141.) Plaintiff was allegedly confronted by Germano and forced to "lock into" a cell which was covered with black soot. (*Id.* ¶ 142.) Plaintiff filed more grievances about his purportedly retaliatory transfer back to the E-Block. (*Id.* ¶¶ 143–46.)

On October 18, 2016, Wilkins responded to Plaintiff's grievances, noting that there was no evidence of retaliation. (*Id.* ¶ 147.) On October 21, 2016, Plaintiff was moved out of the E-Block after apparently experiencing a panic attack and was relocated to the G-Block. (*Id.* ¶¶ 148–49.) Plaintiff avers that on October 31, he told Griffin about the ongoing retaliation he was experiencing for filing his PREA complaint against Garcia and Germano. (*Id.* ¶ 149.) Griffin allegedly responded that he was "well aware" of Plaintiff's complaints. (*Id.* ¶ 150.) On November 1, 2016, after approximately 36 days, Plaintiff was released from his pre-disciplinary confinement and returned to the A-Block. (*Id.* ¶¶ 152–53.)

Plaintiff's disciplinary hearing began on November 16, 2016. (*Id.* ¶ 156.) During this hearing, Plaintiff allegedly introduced "documentary evidentiary proof" that his hot pot had been confiscated and destroyed on May 23, 2016, and that it would therefore have been impossible for Plaintiff to possess a hot pot during the time in which he was charged with creating a fire in his cell. (*Id.* ¶ 159.) Plaintiff avers that Murphy then "flew off into a violent and uncontrollable rage," berating Plaintiff. (*Id.* ¶ 160.) Murphy allegedly called Plaintiff a "big fucking cry baby," and mocked him for complaining about sexual assault. (*Id.* ¶ 161.) Murphy directed Plaintiff to

face the wall and then used his baton to beat Plaintiff's buttocks and legs, injuring Plaintiff's testicles. (*Id*. ¶¶ 164–66.) Plaintiff was then returned to his housing cell. (*Id*. ¶ 167.) On November 17, Plaintiff filed grievances about Murphy's conduct. (*Id*. ¶¶ 168–69.)

Plaintiff also claims that Moving Defendants had conspired to alter and obstruct Plaintiff's grievances about Garcia and Germano. (*Id*. ¶ 172.) Plaintiff claims that Primley attempted to persuade Plaintiff and his medical provider to alter notations in Plaintiff's medical chart from early May 2016 pertaining to Plaintiff's examination following the alleged assault perpetrated by Garcia and Germano. (*Id*. ¶¶ 174–75.) Plaintiff alleges that, after further coercion from Primley, he did alter his statements to medical staff to say that Garcia and Germano merely conducted a pat frisk, which obstructed his ability to successfully use the prison grievance system. (*Id*. ¶¶ 176–78.) Plaintiff also claims that Moving Defendants were aware of his later grievances about Murphy's conduct and refused to take any action. (*Id*. ¶¶ 180–82.) Plaintiff claims that he continued to suffer unspecified acts of harassment and retaliation at Green Haven. (*Id*. ¶¶ 183–84.)

Based on the foregoing, Plaintiff seeks damages for ongoing physical pain, psychological and emotional suffering, and certain personal losses. (*Id*. ¶ 195.) Plaintiff seeks compensatory and punitive monetary damages from all Defendants. (*Id*. ¶ 224.) Although the Amended Complaint alleges multiple counts against various Defendants, the only ones at issue in this Motion are Counts Five and Six, which contend that Moving Defendants conspired to and did violate Plaintiff's rights under the First, Eighth, and Fourteenth Amendments. (*Id*. ¶¶ 216–23.)

B.  Procedural Background

Plaintiff filed his initial Complaint on July 24, 2018 against Defendants and other former defendants who have since been terminated. (*See* Compl. (Dkt. No. 1).) Plaintiff's request to

proceed in forma pauperis ("IFP") was granted on July 26, 2018. (*See* Dkt. No. 4.) On February 5, 2019, Defendants filed a Motion To Dismiss the Complaint. (*See* Dkt. No. 37.) However, instead of opposing that Motion To Dismiss, Plaintiff filed the Amended Complaint. (*See* Am. Compl.) The Amended Complaint omitted several individuals previously named as defendants. (*See id.*) Plaintiff attached a letter to the Amended Complaint specifically noting that he intended to remove them from the Action. (*Id.* at ECF 58.) Accordingly, the Court terminated those individuals from the Action. (*See* Dkt. No. 50.)[3] On June 7, 2019, after receiving a Pre-Motion Letter from Moving Defendants, the Court set a briefing schedule for the instant Motion. (*See* Dkt. No. 47.)

Moving Defendants filed their opening papers on July 31, 2019. (*See* Not. of Mot.; Moving Defs.' Mem.) Plaintiff filed an Opposition on October 15, 2019. (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 57).) Moving Defendants did not file a reply. The Court deems the Motion fully submitted.

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

---

[3] As noted in Plaintiff's letter, these individuals included Anthony J. Annucci ("Annucci"), James Ferro ("Ferro"), Vernon Fonda ("Fonda"), Patrick Griffin ("P. Griffin"), and Robert Johanemen ("Johanemen"). (*See* Am. Compl. ECF 58; Dkt. No. 50.)

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering the Motion, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."

*Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted).

However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the] plaintiff['s] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

B.  Analysis

Moving Defendants seek dismissal of the Amended Complaint on grounds that Plaintiff fails to state a First Amendment retaliation claim, that Plaintiff fails to state a conspiracy claim,

that any verbal threats or harassment attributed to Moving Defendants do not rise to a constitutional violation, that Plaintiff fails to state an Eighth Amendment failure-to-protect claim as to any Moving Defendant, that Plaintiff's claim of obstruction of the grievance process is not constitutionally cognizable, that Plaintiff fails to plausibly allege personal involvement of any Moving Defendant, and that all Moving Defendants are entitled to qualified immunity. (*See generally* Moving Defs.' Mem.) The last argument, however, merely restates the case law on qualified immunity and perfunctorily argues that it protects Moving Defendants. Accordingly, the Court need not and does not consider this argument at this time. *See Moore v. Westchester County*, No. 18-CV-7782, 2019 WL 3889859, at *2 n.2 (S.D.N.Y. Aug. 19, 2019) (refusing to do the same); *Thatcher v. New York State Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2310, 2018 WL 5791973, at *6 n.5 (S.D.N.Y. Nov. 5, 2018) (same and further noting that the defendants may raise it again later in the litigation). The Court addresses the other arguments as needed.

### 1. First Amendment Retaliation Claim

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (citing, inter alia, *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). To state a First Amendment retaliation claim, Plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that . . . [D]efendant took adverse action against . . . [P]laintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, alteration, and quotation marks omitted); *see also Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (same).

"[B]ecause virtually any adverse action taken against a prisoner by a prison official[ — ]even those otherwise not rising to the level of a constitutional violation[ — ]can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)). Moving Defendants argue that Plaintiff's time in keeplock confinement was not the type of adverse action required for retaliation claims and that, even if it was, Plaintiff fails to plausibly allege the causal connection between the confinement and Moving Defendants. (*See* Moving Defs.' Mem. 6–9.)

An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and quotation marks omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[T]he test, however, is not whether [the] plaintiff himself was chilled (if that were the standard, no plaintiff likely would prevail, for the very commencement of a lawsuit could be used by [the] defendants to argue that the plaintiff was not chilled)." *Id.* at 354 (citation, alterations, and quotation marks omitted). It is plausible for keeplock confinement to constitute an adverse action for claims of retaliation. *See Lashley v. Wakefield*, 367 F. Supp. 2d

461, 467 (W.D.N.Y. 2005) (determining that twenty days of keeplock confinement constituted an adverse action) (collecting cases).

Plaintiff appears to allege that he was placed in a 72-hour period of confinement on May 4, 2016, after he told his mental health counselor about Garcia and Germano's purported sexual assault, which triggered a PREA report. (*See* Am. Compl. ¶¶ 79, 83, 86–87.) He was released from this "first" period of confinement on May 7, 2016. (*Id.* ¶ 99.) Although Moving Defendants assume that there was only one alleged 72-hour period of retaliatory confinement, (*see* Moving Defs.' Mem. 8), Plaintiff goes on to allege that on May 11, 2016, he was placed in a second 72-hour period of confinement after he underwent an x-ray for his right shoulder, (Am. Compl. ¶¶ 104–05).[4] Assuming all of Plaintiff's allegations are true, Plaintiff appears to allege a total of six days in confinement as retaliation for filing grievances and pursuing medical care resulting from Garcia and Germano's purported assault. "[Moving] Defendants notably do not cite any caselaw for the proposition that being placed in confinement for six days cannot constitute an adverse action, and indeed they cannot because the Second Circuit and lower courts therein have found that being placed in keeplock or being otherwise confined is indeed an adverse action." *Flood v. Cappelli*, No. 18-CV-3897, 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 12, 2019) (citations omitted); *see also Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding that placing plaintiff in keeplock for three weeks was an adverse action); *Lugo v. Van Orden*, No. 07-CV-879, 2008 WL 2884925, at *4–5 (S.D.N.Y. July 23, 2008) (stating that the holding of *Gill* was not that confinement *must* have lasted for *weeks* and pointing out that "less"

---

[4] There was also a third period of allegedly retaliatory confinement of 36 days prior to Plaintiff's disciplinary hearing. (Am. Compl. ¶ 152.) However, Plaintiff attributes this particular form of retaliation to Murphy, who does not join in the instant Motion, and the Court does not consider this confinement as part of the claims against Moving Defendants. (*See id.* ¶¶ 140, 152.)

adverse action, such as being moved to a different housing unit, have been held to be sufficient to state a claim for retaliation); *Keesh v. Goord*, No. 04-CV-271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007) (holding that placing plaintiff in keeplock for one day during which he may have missed meals constituted an adverse action). The Court cannot conclude as a matter of law that this is a de minimis act that does not constitute an adverse action that would not "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (citation and quotation marks omitted).

However, the Court does agree with Moving Defendants that Plaintiff has failed to plausibly connect any retaliatory confinement to individual Moving Defendants. Section 1983 plaintiffs must plausibly allege a "causal connection" between the protected conduct and the adverse action. *Garcia v. Watts*, No. 08-CV-7778, 2009 WL 2777085, at *11–12 (S.D.N.Y. Sept. 1, 2009); *see also Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) (holding that the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action" (citation, alteration, and quotation marks omitted)). To meet this burden, Plaintiff must allege facts suggesting that the protected conduct was a "'substantial or motivating factor' in the prison officials' decision to take action against [him]." *Smith v. Christopher*, No. 06-CV-1196, 2008 WL 4283519, at *10 (N.D.N.Y. Sept. 18, 2008) (citing, inter alia, *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Van Dunk v. Brower*, No. 11-CV-4564, 2013 WL 5970172, at *8 (S.D.N.Y. Nov. 7, 2013) ("The element of intent [in a First Amendment retaliation claim] requires an assessment of what evidence, if any, demonstrates that Defendants' conduct 'was motivated by or substantially caused by [Plaintiff's] exercise of free speech.'" (second alteration in original) (ultimately quoting *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994))); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of*

*Appeals*, 812 F. Supp. 2d 357, 371 (S.D.N.Y. 2011) (same); *cf. Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (reinstating retaliation claim in part because there was evidence of "retaliatory animus" where plaintiff alleged that officers confronted him directly about his practice of filing grievances before they issued the allegedly false misbehavior report against him).

To begin, Plaintiff does not allege who assigned Plaintiff to confinement. For the first 72-hour period, Plaintiff simply alleges that he was taken to confinement after speaking to a medical provider; the only named individual connected to this event is a Sergeant Neil Yando ("Yando"), who is not a defendant in this Action. (*See* Am. Compl. ¶¶ 82–87.) For the second 72-hour period, Plaintiff alleges he was brought to confinement by an unidentified sergeant after Plaintiff refused to change any details in his PREA report against Garcia and Germano. (*Id*. ¶ 105.) Although Plaintiff claims that he wrote to Wilkins to *complain* about the first period of confinement, (*id*. ¶ 87), and that Primley was somehow behind the effort to get Plaintiff to change his PREA medical report, (*id*. ¶ 105), Plaintiff does not allege that Wilkins or Primley took any steps to facilitate either period of confinement. Griffin and Melville do not appear anywhere in these particular allegations at all. (*See generally id*.) Moreover, any alleged causation is even more tenuous under the circumstances alleged here because no grievance was filed against any Moving Defendant at the time of Plaintiff's allegedly retaliatory confinement, and "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright*, 554 F.3d at 274). Plaintiff appears to assume that Moving Defendants would retaliate on behalf of Plaintiff's grievances filed against Garcia and Germano, but other than alleging that they are all DOCCS employees of varying seniority at

Green Haven, there is simply no plausible connection between *Moving Defendants* and

Plaintiff's initial grievances. Accordingly, the retaliation claims against Moving Defendants are

dismissed. *See Bryant v. Goord*, No. 99-CV-9442, 2002 WL 553556, at *2 (S.D.N.Y. Apr. 12,

2002) ("The grievances that Plaintiff filed prior to the [confinement] at issue here did not involve

any [Moving] Defendants, therefore, there is no basis to assume that [Moving] Defendants

[facilitated confinement] against Plaintiff to retaliate for his filing grievances against other

correction[] officers."); *see also Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *11

(S.D.N.Y. Mar. 27, 2015) (dismissing retaliation claims where the plaintiff failed to allege "any

facts that would support a finding that" certain correction officers "were personally motivated"

by a "grievance they have no apparent connection with") (collecting cases); *Roseboro v.*

*Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (dismissing retaliation claim where the

plaintiff "failed to provide any basis to believe that [the defendant] retaliated for a grievance that

she was not personally named in") (collecting cases).

### 2. Eighth Amendment Failure-to-Protect Claim

The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison

officials to "take reasonable measures to guarantee the safety of inmates in their custody."

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citation omitted); *see also*

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same). "Prison officials are liable . . . for harm

incurred by an inmate if they act with deliberate indifference to the inmate's safety." *Price v.*

*Oropallo*, No. 13-CV-563, 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citation

omitted). To satisfy the deliberate indifference standard, a plaintiff must show that (1) "he is

incarcerated under conditions posing a substantial risk of serious harm," and (2) "the defendant

prison officials possessed sufficient culpable intent." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511

U.S. at 834). The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 30, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry." *Hayes*, 84 F.3d at 620. In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm[,] and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* (citation omitted).

As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Price*, 2014 WL 4146276, at *8 (explaining that to establish deliberate indifference, "a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety" (citation omitted)). A defendant's knowledge can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." (citation and quotation marks omitted)).

It is unclear on what grounds Plaintiff intends to assert a failure-to-protect claim against Moving Defendants. Regardless, here, "it is unnecessary to decide whether [Plaintiff] has satisfied the objective prong of *Farmer* because he has failed to satisfy the subjective prong" as to any Moving Defendant. *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013) (citation and footnote omitted). That is, Plaintiff fails to allege that any Moving

Defendant "knew of and disregarded a particular risk to his safety." *Id*. (citation omitted). To the extent Plaintiff seeks to allege that Moving Defendants must have known about the existence of the so-called "Beat Down/Goon Squad" simply because they hold supervisory positions, such claims are dismissed. Simply holding a supervisory position at a correctional facility is insufficient to create personal involvement in any specific constitutional violation. *See Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)); *see also Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (dismissing a defendant for lack of personal involvement because, among other reasons, the complaint did not allege that the defendant "interacted with . . . any of the [prison] employees responsible for" the allegedly unconstitutional act); *Samuels v. Fischer*, 168 F. Supp. 3d 625, 636–37 (S.D.N.Y. 2016) (holding that conclusory allegations that a defendant had knowledge of an allegedly unconstitutional act are insufficient to show personal involvement and collecting cases).

Nothing in the Amended Complaint alleges that any Moving Defendant "ha[d] knowledge" that Garcia and Germano would attack Plaintiff in April 2016, that Freeman would attack Plaintiff in May 2016, or that Murphy would attack Plaintiff during his disciplinary hearing. *Hayes*, 84 F.3d at 620. Melville interviewed Plaintiff regarding Garcia and Germano's alleged attack *after* it had already happened. (Am. Compl. ¶ 119.) And Plaintiff does not allege that, during that interview, he gave Melville any reason to know that Murphy would later attack

Plaintiff during the disciplinary hearing.[5]  Although Plaintiff does allege that he told Melville that he feared further abuse and harassment if he remained in E-Block, (*id.* ¶ 128), Plaintiff was moved to A-Block two days after his second interview with Melville, (*id.* ¶ 132).  Melville, therefore, did not "disregard[]" Plaintiff's concerns about his safety; in fact, he took action to try to remove Plaintiff from these purported threats.  *Price*, 2014 WL 4146276, at *8.[6]  Similarly, Plaintiff's grievances to Wilkins are alleged to be about his unnecessary confinement prior to Plaintiff's disciplinary hearing, (Am. Compl. ¶ 113), and not about any foreseeable risk of substantial harm that Wilkins subsequently ignored.

To the extent Plaintiff seeks to hold Griffin responsible for investigating and dismissing as "unsubstantiated" Plaintiff's general concern about rumors of the "Beat Down/Goon Squad," (Am. Compl. ¶¶ 32–33), these allegations do not sufficiently allege a failure to protect claim. Generally, "an inmate's communications about generalized safety concerns or vague concerns of future assault by unknown individuals are insufficient to provide knowledge that the inmate is

---

[5] In any event, based on Plaintiff's allegations, Murphy spontaneously "flew off into a violent and uncontrollable rage" during the disciplinary hearing.  (Am. Compl. ¶ 160.)  "Courts routinely deny deliberate indifference claims based upon surprise attacks" such as this one. *Zimmerman v. Macomber*, No. 95-CV-0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (citations omitted).

[6] Furthermore, other than the specifically articulated alleged attacks by Garcia, Germano, Freeman, and Murphy, Plaintiff's general claims of continued abuse and harassment are conclusory and insufficiently pled.  Plaintiff does not allege what kind of abuse or harassment he suffered or who was involved or that he articulated more specific concerns to Melville.  (*See, e.g.*, Am. Compl. ¶¶ 125, 128, 133.)  Moreover, even if Plaintiff had specifically noted instances of verbal abuse to Melville, general verbal threats and harassment, without more, are not constitutional violations cognizable under § 1983.  *See Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury[,] no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." (quotation marks omitted) (collecting cases)).  Therefore, Melville still would not have been put on notice of an impending, substantial risk of serious harm to Plaintiff.

subject to a substantial risk of serious harm." *Anselmo v. Kirkpatrick*, No. 19-CV-0350, 2019 WL 2137469, at *4 (N.D.N.Y. May 16, 2019) (citations and quotation marks omitted); *see also Johnson v. Schiff*, No. 17-CV-8000, 2019 WL 4688542, at *17 (S.D.N.Y. Sept. 26, 2019) (same). Rather, a failure-to-protect claim requires the plaintiff "allege[] that he informed [the prison official] about a specific fear of assault and [was] then assaulted." *Tubbs v. Venettozzi*, No. 19-CV-126, 2019 WL 2610942, at *5 (N.D.N.Y. June 26, 2019) (citation and quotation marks omitted); *see also Velez v. City of New York*, No. 17-CV-9871, 2019 WL 3495642, at *4 (S.D.N.Y. Aug. 1, 2019) ("Those cases which have found officers potentially liable for failing to prevent an attack involved clear and specific threats against an inmate." (collecting cases)).

It is possible for a plaintiff to "state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to *all* inmates at the facility." *Parris*, 947 F. Supp. 2d at 363 (emphasis added). However, "[t]o do so, a plaintiff must allege that the defendants knew of a history of prior . . . attacks similar to the one suffered by the plaintiff and that the measures they should have taken in response to such prior attacks would have prevented the attack on the plaintiff." *Id.* (citation omitted). As mentioned above, no such allegations exist here. At most, Plaintiff filed a grievance about certain vague, aggressive, threatening statements he heard an unnamed correction officer make regarding a "new fucking regime." (Am. Compl. ¶ 30.) However, Plaintiff does not allege that he informed Griffin or any other Moving Defendant about attacks similar to the ones he experienced. "Therefore, [Plaintiff] has failed to allege sufficient facts to state a claim that [Moving Defendants] were deliberately indifferent in failing to protect him against a general risk of harm." *Parris*, 947 F. Supp. 2d at 363–64 (citation omitted); *see also Blandon v. Aitchison*, No. 17-CV-65, 2019 WL 1206370, at *7 (S.D.N.Y. Mar. 14, 2019) ("[I]n order to find that a plaintiff has sufficiently pled a claim for deliberate

21

indifference based on a failure to protect him against a general risk of harm to all inmates, courts typically require specific allegations of a pattern of analogous [officer]-on-inmate attacks that would make the attack suffered by the plaintiff foreseeable." (collecting cases)). Accordingly, any failure to protect claim against Moving Defendants is dismissed.

### 3. Fourteenth Amendment Claim

It is unclear whether, by invoking the Fourteenth Amendment in Counts Five and Six, Plaintiff intended to assert due process claims against Moving Defendants. For the sake of completeness, however, the Court addresses whether such a claim would be legally cognizable. The Court construes Plaintiff's allegations to suggest that Plaintiff claims his constitutional rights were impeded by efforts to force Plaintiff to change the medical information he provided to caretakers regarding Garcia and Germano's alleged attack on Plaintiff. (*See* Am. Compl. ¶¶ 105, 173–78.) According to Plaintiff, because of Primley's repeated insistence that Plaintiff change his medical records regarding the attack, Plaintiff amended his medical records to say that Garcia and Germano had merely conducted a pat frisk. (*Id.* ¶ 176.) This presumably hurt Plaintiff's credibility and spoiled evidence that would have been helpful in investigating Plaintiff's grievances about the incident. However, even if assumed true and sufficiently pled, such allegations do not state a claim for a violation of Plaintiff's constitutional rights.

"It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances." *Crichlow v. Fischer*, No. 15-CV-6252, 2017 WL 920753, at *7 (W.D.N.Y. Mar. 7, 2017) (citation omitted); *see also Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at *7 (S.D.N.Y. Sept. 28, 2017) ("[The p]laintiff did not have a liberty interest to access the [prison] grievance program that would provide a basis for a constitutional due process claim here." (citations omitted)); *Njasang Nji v. Heath*, No. 13-CV-

200, 2013 WL 6250298, at *6 (S.D.N.Y. Dec. 2, 2013) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." (citation and quotation marks omitted)); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011), ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest." (citations omitted)), *aff'd*, 548 F. App'x 29 (2d Cir. 2013); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment." (citations omitted)). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is the course taken by [P]laintiff here: directly petitioning the government for redress of his claims." *Harris v. Westchester Cty. Dep't of Corrs.*, No. 06-CV-2011, 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008) (collecting cases). Consequently, "courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures." *Martinez v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at *3 (S.D.N.Y. Jan. 9, 2017) (citation, alteration, and quotation marks omitted). Accordingly, any due process claim against Moving Defendants based on purported interference with the grievance process is also dismissed.

### 4. Conspiracy Claim

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citation omitted); *see also Corsini v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (same) (citing *Ciambriello v. County of Nassau*,

292 F.3d 307, 324–25 (2d Cir. 2002)).  Plaintiff has failed to satisfy this standard.

Plaintiff repeatedly refers to a "conspiracy" between various Defendants throughout his Amended Complaint.  (*See generally* Am. Compl.)  But other than the fact that Moving Defendants all work at Green Haven, Plaintiff alleges no facts to support an inference that Moving Defendants were acting in concert in furtherance of a conspiracy to violate Plaintiff's constitutional rights.[7]  This is plainly insufficient to state a § 1983 conspiracy claim.  *See Ciambriello*, 292 F.3d at 325 ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed . . . ." (citation and quotation marks omitted)); *Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *12 (S.D.N.Y. Aug. 28, 2017) (dismissing a § 1983 conspiracy claim because the complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out" (citation omitted)); *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858925, at *5 (S.D.N.Y. Feb. 29, 2016) ("Allegations of a conspiracy to violate civil rights must be pleaded with specificity, and an otherwise invalid § 1983 claim cannot survive a motion to dismiss merely by mentioning the word 'conspiracy.'" (citation, alterations, and quotation marks omitted)); *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009)

---

[7] Although the Court takes no position on the sufficiency of Plaintiff's other allegations at this time, the Court notes the contrast between Plaintiff's generic allegations of a conspiracy between Moving Defendants with, for example, the specific allegations that Garcia and Germano engaged in communication with each other through body language before they both attacked Plaintiff.  (*See* Am. Compl. ¶¶ 44, 46, 51–53.)

(dismissing conspiracy claim where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked together, that . . . an agreement existed" (citations omitted)).[8]

### III. Conclusion

For the foregoing reasons, Moving Defendants' Motion To Partially Dismiss the Amended Complaint is granted. Because this is the first adjudication of Plaintiff's dismissed claims, the dismissal is without prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff should include within that second amended complaint all changes to correct the deficiencies identified in this Opinion & Order that Plaintiff wishes the Court to consider. Plaintiff is advised that the second amended complaint will *replace*, not supplement, the Amended Complaint. The second amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his dismissed claims may be dismissed with prejudice. The Action will then proceed on the remaining claims, i.e., the ones that were not addressed in the instant Motion.

---

[8] Moreover, even assuming that there was a conspiracy to do *something*, at most Plaintiff appears to allege that Moving Defendants conspired to stifle and obstruct Plaintiff's use of the IGP, which, as discussed above, does not underlie a legally cognizable constitutional claim. *See supra* Section II.B.3. A requirement of a § 1983 conspiracy is that the defendants conspired to "inflict an *unconstitutional* injury," not simply any injury at all. *Pangburn*, 200 F.3d at 72 (emphasis added) (citation omitted).

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No.

51), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

Dated: March 12, 2020
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE